Filed 6/29/22
See concurring and dissenting opinion

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FERNANDO ROJAS,<br><br>    Defendant and Appellant. | F080361<br><br>(Kern Super. Ct. No. BF171239B)<br><br><br>**OPINION** |


APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Sharon Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Daniel B. Bernstein, Robert Gezi, Amanda D. Cary, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II., IV., V, and VI. of the Discussion.

**SEE CONCURRING AND DISSENTING OPINION**

Defendant Fernando Rojas's fellow gang member shot and killed an individual with whom defendant had an altercation moments prior. Defendant was convicted of first degree murder with a gang special circumstance finding; and active gang participation.

The Attorney General concedes that, as a result of the passage of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), defendant's conviction for active gang participation and several enhancements must be reversed. We accept that concession.

We reject defendant's remaining contentions, including a *Batson*/*Wheeler*[1] claim and a challenge to his gang-murder special circumstance based on changes made to Penal Code section 186.22[2] by Assembly Bill 333. We hold that allowing Assembly Bill 333's changes to section 186.22 to affect section 190.2, subdivision (a)(22) would constitute an impermissible amendment of Proposition 21.

We reverse the active gang participation conviction and several enhancements, but otherwise affirm.

## BACKGROUND

In an amended information filed August 14, 2019, the Kern County District Attorney charged defendant Fernando Rojas with premeditated murder (count 1; §§ 187, subd. (a) & 189), active gang participation (count 2; § 186.22, subd. (a)), and possession of a firearm as a felon (count 4; § 29800, subd. (a)(1).)[3] The information further alleged: Defendant committed the murder for the benefit of, at the direction of, or in association with the Varrio Chico Lamont criminal street gang; firearm enhancements to the murder count under sections 12022, subdivision (d) and section 12022.53, subdivisions (d) and (e)(1); an out-on-bail enhancement (§ 12022.1); a prior juvenile adjudication strike

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[2] All further statutory references are to the Penal Code unless otherwise stated.

[3] Codefendant Victor Nunez was also charged with counts 1 and 2, as well as possession of a firearm as a misdemeanant (count 3; § 29805.)

(§ 667, subds. (c)–(j) & § 1170.12, subds. (a)–(e)); and three prior prison term enhancements (§ 667.5, subd. (b).)

The court granted defendant's motion for acquittal on count 4. (§ 1118.1.) A jury convicted defendant on counts 1 and 2. The jury also found true the gang enhancement (§ 186.22, subd. (b)(1)), gang-murder special circumstance (§ 190.2, subd. (a)(22)), and firearm enhancements under sections 12022.53, subdivisions (d) & (e)(1) and 12022, subdivision (d) as to count 1.

The court granted a prosecution motion to dismiss the on-bail enhancement and prior conviction enhancements. The court found true the prior strike adjudication allegation.

The court sentenced defendant to life in prison without the possibility of parole on count 1, plus 25 years to life (§ 12022.53, subds. (d) & (e)(1)), plus three years (§ 12022, subd. (d)), plus a stayed (§ 654) term of six years on count 2. The court imposed various fines and fees, including a parole revocation restitution fine of $300. (See § 12022.45.)

**FACTS**

Surveillance footage from an internet casino showed defendant arriving in a silver BMW at around 1:15 a.m. on February 3, 2018. Defendant entered the casino, whereafter he and Nunez conversed, drank beer, and played a casino game.

At around 2:04 a.m., a man named Brandon Ellington was outside the casino exchanging something with an individual whose car door was open. Ellington had something in his hand. A package of marijuana was later found in his pocket. An unidentified individual hit Ellington in the face.

Around the same time, defendant walked out with an unknown individual. Nunez was standing at the entrance. Defendant extended his left arm while holding what appeared to be a beer bottle. Ellington took off his shirt, squared off against defendant, and extended both of his arms over his head. Defendant threw the beer bottle. Ellington then left the view of the camera.

Defendant and Nunez jogged to their BMW toward the entrance of the casino. Defendant drove the BMW away from the casino with Nunez in the front passenger's seat. Defendant made a northbound turn onto South Union Avenue at about 2:08 a.m.

Surveillance footage from a nearby store showed a silver BMW pulling up near Ellington. The footage shows an individual exiting the passenger's side followed by muzzle flashes. Ellington ran toward a nearby market after being struck by a bullet. Eventually, Ellington collapsed. His body was later found by law enforcement at that location. The shooter then reentered the BMW which sped away.

Ellington had suffered a gunshot wound to his chest. The wound was lethal, striking Ellington's left lung, heart, and then right lung before exiting the body. The wound had "stippling" – which is partial gunpowder burns. However, the wound had no visible soot. Based on "rough generalizations," a pathologist testified that stippling without soot is consistent with the firearm being between six to 18 inches away from the victim when the lethal shot was fired. Ellington also had blunt force injuries.

Five spent nine-millimeter shell casings were found at the scene.

On February 9, 2018, an undercover officer arrested defendant at the same internet casino. The same day, officers located Nunez hiding behind a shipping container in a parking lot. Nunez tossed a black handgun away before surrendering. A criminalist from the regional crime laboratory testified that, in his opinion, it was the gun that fired the spent casings at the scene. The DNA profile on the gun matched Nunez.

Defendant denied involvement to law enforcement. He said he heard about the shooting from other people and from newspapers but was not personally involved. Defendant initially claimed he was not even at the internet casino on the night Ellington was killed. However, officers showed him a still photograph from the surveillance footage, and defendant admitted he was depicted therein. Defendant then admitted he was drunk. Defendant claimed Ellington had a knife, was saying things like, "I'll kill all

4.

you guys," and "white pride." However, defendant consistently denied involvement in the shooting.

Defendant said he had "connections" and that everyone knew he was "from the streets." Defendant said people listen to him because he is a "big guy."

Officers asked defendant if he was involved in gangs in Lamont. Defendant claimed he was not currently active.

Deputy Sheriff Fernandez testified as a gang expert for the prosecution. Fernandez testified about a Kern County gang called Varrio Chico Lamont, including common tattoos among its members, their hand signs, primary activities, and predicate offenses.[4] Varrio Chico Lamont is a subset of Lamont 13.

Deputy Fernandez testified that "respect" is one of the primary things a member of the Varrio Chico Lamont gang seeks. If a perceived disrespect to a member of Varrio Chico Lamont went unanswered, the disrespected member would lose standing in the gang. Thus, disrespected members would be required to respond, usually with violence, to "save face."

Gang members also commit violent crimes like murder to enhance their reputation within the gang and the gang's reputation in the community. This reputation enhancement discourages people from "talk[ing]" to law enforcement, which allows the gang to continue committing crimes.

Another officer also testified about prior contacts with defendant suggesting his involvement with the Varrio Chico Lamont gang. Defendant had several tattoos that Deputy Fernandez believed were gang-related, including one that read, "VCL," two that read, "Lamont," and a street sign with the street names "Santa Clara" and "Kearney."[5] Fernandez opined that defendant and Nunez were active members of the Varrio Chico

---

[4] Defendant and Nunez were not involved in the predicate offenses.
[5] The area around the intersection of these two streets was a "stronghold" area for the gang.

5.

Lamont gang on February 3, 2018. Fernandez also testified that a hypothetical crime aligned with the prosecutor's view of the evidence would be considered to have been committed "in association with" the Varrio Chico Lamont gang.

## DISCUSSION

**I.     Defendant Has Not Established Reversible Batson/Wheeler Error**[*]

**A.     *Background***

Defendant argues on appeal that the prosecutor's reasons for dismissing three specific jurors with Hispanic surnames – A.M., A.L., and C.C.[6] – were not plausible or reasonable.

The jurors filled out a prospective juror questionnaire. The questionnaire explained that any questions or concerns based on the prospective juror's answers would be addressed outside the presence of other jurors. The questionnaire asked the following questions:

> "1.     Have you ever been affected, directly or indirectly, by gang activity or gang violence?
>
> "2.     Has anyone close to you, such as a friend or relative, ever been affected, directly or indirectly, by gang activity or gang violence?
>
> "3.     Have you ever been accused of being in a criminal street gang?
>
> "4.     Has anyone close to you, such as a friend or relative, ever been accused of being in a criminal street gang?
>
> "5.     Have you ever witnessed or investigated, formally or informally, any act of alleged gang crime?
>
> "6.     Do you have a special gang-related concern that would make it extremely difficult for you to sit as a juror in this case?

---

[*] See footnote, *ante*, page 1.

[6] While potential jurors are not afforded the same confidentiality as seated jurors, we will be discussing in this opinion answers they provided on a questionnaire labeled "confidential" and therefore suppress both first and last names. It is important to note that the Attorney General agrees that all three individuals have "Hispanic surnames."

"7.    Do you have any training or education about criminal street gangs?

"8.    If you answered 'yes' to any question above, is that going to affect your ability to give all sides a fair trial?

"9.    This case is expected to last through September 20, 2019.  We will not be in session on September 2, 2019 (Monday) and September 12–13, 2019 (Thursday and Friday).  Do you have any hardship that would make it difficult for you to serve as a juror in this case?

Prospective jurors who answered "yes" to any of the questions were brought in for individual questioning.  Prospective jurors who answered "no" to all of the questions were asked to return later for general voir dire.

C.C. and A.L. answered "no" to all the gang-related questions and were asked to return for general voir dire.[7]

A.M. answered "yes" to question four.  When asked to explain his answer, A.M. stated:

"It was, like, a while ago.  It was a couple years back.  But a friend of mine, it's 'cause he had, like, tattoos, but they were just like words and stuff like that, and one day we were just, like, walking around the store and a police officer stopped us.  He just wanted to check and see if he was related to any type of gang.  That was pretty much it."

The court asked if his friend was part of a gang and A.M. responded, "No, he was not."

The court asked A.M. if he would be able to set aside what he and his friend went through and keep it separate from the case.  A.M. replied, "Of course."  A.M. said he could give all sides a fair trial.

Neither defense counsel had questions for A.M.  When the prosecutor was given the opportunity to ask questions, the following exchange took place:

"Q.    The writing that you were talking about, the tattoos, what did it say?

"A.    It was just more like peace words and stuff like that, like freedom, stuff like that.

---

[7] A.L. and A.M. responded "yes" to the hardship question.

"Q.     Okay.  So did you view that as like a negative experience with law enforcement or just like it was an experience with law enforcement.

"A.     It was just an experience.

"Q.     And your friend, did he view that as a negative experience?

"A.     I haven't talked to him in years after that, but he – he was more like less respected with it.  He didn't really respect cops after that.  I don't know, he was just like – he didn't enjoy the cop's company, the police, unfortunately, at all.

"Q.     And you are not real good friends with him anymore?

"A.     No. It's been years."

A.M. was asked to return for general jury voir dire.

During general jury voir dire, the court asked prospective jurors if they knew anyone who worked in law enforcement or the legal profession.  A.M. said he volunteers at the Sheriff's Activities League and had met three sheriffs there.  A.M. told the court this would not affect his vote as a juror.  None of the sheriffs he met were on the witness list for the present case.

Later in voir dire, the court asked the following question of prospective jurors:

"If you were not here today, what would you be doing?  If you work outside of the home, what type of work do you do?  I do not need to know the name of your employer unless you work for a public or government entity. …

"If you have a significant other, we would like to know that.  If that significant other works outside of the home, what type of work does that person do?

"If you have children, how many do you have, what are their approximate ages, and what are they doing for a living?

"I do not want to know your physical residential address, but I would like to know in which part of the county you reside; so if you live in Bakersfield, you can identify it by region, such as northeast, northwest, central, southeast, southwest, et cetera.  If you live outside of Bakersfield, you can identify it by the city name in which you live, so Wasco, Tehachapi, Delano, Wofford Heights, et cetera."

8.

To this question, A.L. responded:

> "I'm a preschool teacher, and my significant other is a manager that works with people of special needs. I have four children, 11, nine, four, and one. They're all in school or in daycare. And we live in the southwest."

Responding to the same question, A.M stated:

> "I work as a production worker for Bolthouse and my significant other is currently a college student. I have no children. And I live in the northwest."

When it was time for counsel to ask questions, defense counsel asked one of the prospective jurors whether she understood that the prosecutor had the burden of proof even if the defense did not make arguments or do anything at all. After she responded affirmatively, defense counsel said, "[A.M.], you're nodding your head. Do you agree with that?" A.M. responded, "Yeah, I'm nodding." Counsel then asked what A.M. thought about the possibility of defendant Nunez choosing not to testify. A.M. responded, "It's his choice."

Later, counsel for Nunez had the following exchange with A.L.:

> "Q. You've never been on a jury before. Is that right?
>
> "A. No.
>
> "Q. Have you ever been called up for jury service?
>
> "A. Yes.
>
> "Q. And up here where you're answering questions?
>
> "A. Yes.
>
> "Q. And you're a preschool teacher?
>
> "A. Correct.
>
> "Q. So you have a college degree?
>
> "A. Yes.

9.

"Q.     And I didn't hear what you husband does.

"A.     He's a supervisor that works with – in a group home with people of special needs.

"Q.     Like older people?

"A.     No. They range from different ages.

"Q.     And how long have you been a preschool teacher?

"A.     Ten years now.

"Q.     And you have four minor children. Is that right?

"A.     Yes.

"Q.     Do you have any exposure to the criminal justice system, like, you know, maybe you read a lot of newspaper articles about it or you know someone that talks to you about it or you watch TV shows?

"A.     I live a very sheltered life because of my kids.

"Q.     Okay.  Spend all your time with your kids.

"A.     Pretty much.

"Q.     Do you know about our jury system and how it works, for the most part?

"A.     Yes, I do.

"Q.     And you understand how important it is to be fair and impartial?

"A.     Yes, I do.

"Q.     And how important it is to follow the law the judge gives you as he gives it to you, even if you don't agree with it?

"A.     Yes.

"Q.     And you think you can do that?

"A.     Yes.

"Q.     Is there anything about the nature of this case that you think may cause a problem for you being a juror –

10.

"A.   No.

"Q.   -- with very serious charges?

"A.   No.

"Q.   Nothing?

"A.   Nothing."

Later still, counsel for Nunez had the following exchange with A.M.:

"Q.   [A.M.], I didn't get down what you do for a living.

"A.   Right now I'm just doing production work at Bolthouse.

"Q.   At Bolthouse?

"A.   Yeah.

"Q.   That's like an agricultural company?

"A.   Yeah, pretty much.

"Q.   Is that in Delano?

"A.   No.  It's actually here in Bakersfield.

"Q.   And how long have you been doing that?

"A.   For only a couple months.  I think three.

"Q.   And how old are you?

"A.   Nineteen.

"Q.   Nineteen.  Okay.  [¶]  So you just got out of high school pretty recently?

"A.   Yeah.

"Q.   Class of –

"A.   2018.

"Q.   '18?

"A.   Yeah.

"Q.     And what part of the county do you live in?

"A.     I'm not too sure, but I live by, like, Pioneer.

"Q.     Pioneer?

"A.     I'm not too sure of that area.

"Q.     Is that like east Bakersfield?

"A.     Pretty much.

"Q.     And do you live with your parents?

"A.     Yeah.

"Q.     And are you working full-time?

"A.     Yeah, I work full-time.

"Q.     And you said you're finding the time to volunteer at the Sheriff's Activities League, right?

"A.     Yeah.

"Q.     When do you do that?

"A.     I haven't done it in a couple months because I work graveyards. The time they open is usually around 4:00. That's the time I start work.

"Q.     What kind of volunteer work did you do there?

"A.     I would help out with like – 'cause they teach boxing there. I would help out moving the ring or teach kids how to box.

"Q.     So you were working with kids in sports?

"A.     Yeah.

"Q.     Do you have a boxing background?

"A.     I used to box for a couple years.

"Q.     Okay.  Do you have any plans or goals to become a sheriff's deputy or law enforcement?

"A.     No.

12.

"Q.    You're just there to help the kids?

"A.    Yeah."

Defendant's counsel asked the prospective jurors how much they wanted to be a juror in the case, on a scale from one to 10. A.L. said "five" because "it sounds interesting," but she did not "like the length of it, how long it's supposed to go" because her oldest child was going to camp. Her oldest usually walked one of his siblings to school, so A.L. wondered what she was going to do. A.M. responded to the same question: "around eight."

The prosecutor explained aider and abettor liability to prospective jurors and observed that a person could be liable for a bank robbery even though they were "just the driver" and "never set foot into the bank." The prosecutor asked A.M. if he was "okay with the law being that way." He responded, "Yes."

Later, the prosecutor and A.M. had an exchange wherein A.M. said he had volunteered with the Sheriff's Activities League for four years and planned to resume volunteering there once his work shift changes. A.M.'s "significant other" was a college student studying English and psychology and was living with her mother.

The prosecutor later posed a hypothetical to A.L. and the following exchange ensued:

"Q.    [...] Say all of you are chosen to be on this jury and we go in the back and I take my cell phone out and I start playing Words with Friends. We've already listened to all the evidence in the case and it's time to deliberate, right, and we go in the back and I get on my phone. What would you do? [¶] [A.L.], what would you do in that situation? And say you're the foreperson

"A.    I would tell the individual to put that phone away and let's talk about what we're supposed to be doing, focus.

"Q.    So we're role-playing. It's me that's on the phone and I'm going to respond I have a high score, we listened to the same evidence, just let me know how you guys vote.

"A.    I would tell you put it away.

13.

"Q. It's a high score.

"A. I don't care. Put it away.

"Q. That's mean. [¶] Say I continue to do that and I don't listen to you. What do you do next?

"A. I would probably talk to the judge and let him know hey, you know what, this friend right here is not listening to me."

## B. *Challenges*

Outside the presence of the venire, defense counsel jointly challenged L.C. and E.R. The court dismissed E.R.R. for hardship reasons.

The prosecutor exercised a peremptory challenge on A.M. The defense then jointly exercised a peremptory challenge on prospective juror Jo.B. The prosecutor next exercised a peremptory challenge on prospective juror, A.H. The defense then exercised a joint peremptory challenge to prospective juror E.B. The dismissed prospective jurors were replaced, the new panel members were questioned, and challenges resumed. The prosecutor exercised a peremptory challenge on A.L. The defense jointly exercised a peremptory challenge as to V.H.

The prosecutor stated he accepted the jury panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror G.A. The prosecutor then again accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror M.W. Again, the prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror P.R. P.R. was replaced on the panel by prospective juror D.M., who the prosecutor then dismissed with a peremptory challenge. The defense jointly exercised a peremptory challenge as to prospective juror C.H.

Additional prospective jurors were called forward, including C.C. The court asked the new prospective jurors to provide the personal information previously provided by other prospective jurors. C.C. explained she is an "administrative assistant/ACES mentor" for a school district and lived in Delano. C.C. was single and had no children.

14.

Later, C.C. said:

"I can follow the concept of the law. I don't have prior jury service. I've never been a victim of a crime, close to me either, anybody close to me. Nobody close to me has been charged or accused of committing a crime. I do know I have a cousin and two uncles who are retired from the prison. And then my cousin, he's a counselor as Wasco State Prison. I don't recognize anybody from the witness list. I don't recognize attorneys or defendants. I don't recognize my prospective jurors. And I can follow the law as instructed in this case."

Nunez's counsel asked if there was anything about her relatives' jobs that would affect her decision as a juror, and C.C. responded, "No, sir."

Counsel later asked what her job entailed, and C.C. explained: "Mainly I work with the extended learning program, so I just get the day ready for all the managers of the after-school program and daycare programs. I'm the director of the extended learning program." The extended learning department included afterschool programs, preschool, summer school and daycare.

C.C. was currently in college and did not have a teaching credential or college degree.[8] She planned to earn a degree in early childhood development and become a teacher after obtaining a credential in special education and general education. In later questioning, she said she definitely wanted to become a teacher but was not sure about special education versus general education.

When asked what she thought of the criminal justice system, C.C. said, "I really don't pay mind to it." C.C. said good jurors were important to a fair system and that she believed she could be a fair and unbiased juror.

Defendant's briefly questioned C.C. about whether jury service would interfere with her college studies. C.C. said it would not affect her educational advancement because she was studying online.

---

[8] C.C. later said she would *starting* her bachelors program in January.

When asked how much she wanted to be on the jury on a scale from one to 10, C.C. responded, "Like an eight." When asked why, she said, "I'm interested and, like I mentioned before, I've never experienced this and I would like to experience it." She said, "Since I never pay mind to it, I thought since I'm here I might as well do it."

The challenge process eventually resumed, beginning with the prosecutor. The prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror L.D. The prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror Ji. B. The prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror S.S. S.S. was replaced by C.C., who the prosecutor dismissed with a peremptory challenge.

The defense then made a motion pursuant to *Wheeler*, *supra*, 22 Cal.3d 258 and *Batson*, *supra*, 476 U.S. 79. Defendant's counsel argued the prosecutor had dismissed four jurors of Hispanic descent "based upon their names and visual."

The prosecutor responded by observing that he had accepted the panel with people of Hispanic descent on numerous occasions only to have them removed by the defense. The prosecutor acknowledged C.C. was of Hispanic descent based on her appearance and name. The prosecutor explained, "Her responses in regards to the field that she wants to go into and her physical demeanor on Friday were things that I looked at in terms of dismissing her, and appears that she lacks, I guess, the life experience that I'm looking for in a case like this."

The prosecutor then offered his explanation for the other three dismissals:

"The People's 3rd was [A.L.] who was similarly situated; although, she was a little bit older. But her responses in regards to wanting to be on the jury and the type of job that she has was concerning to me. I had thought about it, I ended up dismissing her.

"My second was [D.M.]. She's the one who had green hair. All of it was green. She was young, she had multiple visible tattoos, which was concerning for me. Her responses in the gang questionnaire concerned me.

16.

"And then the first person I believe I dismissed was [A.M.] His lack of life experience was the biggest thing for me in terms of being able to sit through the jury, listen to the evidence, the length of it. I don't believe he had the experience to be able to listen to all of it, weigh it, and then finally come to a conclusion."

Counsel for Nunez said he intended to challenge the dismissal of C.C. specifically. He said he did not notice any issues with C.C.'s body language, that she appeared to be intelligent and was "gainfully employed." Counsel argued the prosecutor's stated reasons for dismissing C.C. were "quite vague" and insufficient.

Defendant's counsel challenged the dismissal of all four prospective jurors with Hispanic surnames. Counsel observed A.M. volunteered as a boxing coach. He argued that while A.M. was 19 years old, that did not mean he did not have sufficient life experience to judge any case. He said that did not appear to be an issue with respect to A.M.

Defendant's counsel acknowledged that A.H. had been injured in an attempted robbery but had fully recovered. A.H. had some knowledge of gangs, but not extensive knowledge.

Defendant's counsel observed D.M. had a job as a coach for developmentally disabled individuals. He argued, "I don't know what raises concern, in this day and age, about tattoos on a woman's body anymore, considering the number of people I've seen and number of women I've seen with tattoos on their body." Defendant's counsel acknowledged that D.M. "had family and friends that are affected by gangs, family members involved in gangs, including shot and killed in Kern County, has some in prison doing life."

With respect to C.C., defendant's counsel said the prosecutor had asked very few questions of her. Counsel observed C.C. was intelligent, educated, and fairly articulate.

The court found that a prima facie case had been made because the four jurors were members of a cognizable group. The court asked the prosecutor to restate why he had released the four jurors.

17.

In discussing A.H., the prosecutor said he was concerned with his body language during questioning, his responses to the gang questionnaire, and the fact he was from Delano. The prosecutor also said,

"[H]e still maintains friendships with gang members and he was freely admitting that. To me that's a little bit concerning. These weren't family members, they were friends of his. If he's willing to associate with individuals like that, then, to me, it's showing poor judgment. And, based on that, I did let him go."

The prosecutor then discussed A.L. as follows:

"[A.L.] was the preschool teacher. She had been doing that for ten years, dealing with special needs. The [*sic*] she had never been on a jury before. She gave a response of five as to wanting to be here or not. I haven't had much luck with teachers in that area in my previous trials. She also has – I think even though she wanted to be on the jury, she stated it was a five, but she wanted to see what it's like, her body language and with that background and schooling, it was concerning to me. And considering I have 30 preempts total, I figured why take a chance on somebody versus someone that I think would be better for me. So based on that, I dismissed her."

The prosecutor then discussed A.M. as follows:

"[A.M.] is the one who volunteered at SAL. Stating he was 19, that lack of life experience. He's working a production type job at Bolt House. The desire to work at SAL was not in terms of wanting to be a peace officer. I followed up on that. He said he had no intention of being a peace officer. His appearance in court, I noted that he kind of wore, couple days in a row, some of the same items of clothing. Concerning to me as well. When you take all these factors into consideration, I have 30 preempts, I did exercise my peremptory on him as well."

Later, the prosecutor discussed C.C. as follows:

"[C.C. is] from Delano. Yes, she does have a good job as an admin assistant; however, she still is young and how her projected – her intended field of study, which is to be a teacher and possibly be a special ed, as my previous individual, [A.L.], I have concerns of individuals that I believe they're very sympathetic in how they view things. I want a juror who's going to be able to view things without sympathy or bias. And those are questions I went into, that my personal experiences that the teachers in that

18.

field tend to go into that for some reason and, based on that, I did dismiss her."

The prosecutor then referenced that he frequently accepted the panel as constituted. The court said, "Just for the record … it appears that you accepted three times in a row, followed by four times in a row. So you have accepted seven separate times."

The court then stated its ruling as follows:

"The court does accept [the prosecutor's] representations that he released five individuals for group neutral reasons. Some reasons that have been articulated following the category of juror characteristics such as age, body language, as well as an unconventional lifestyle, those certainly do qualify as juror characteristics that are group neutral and do not apply, specifically, to one cognizable group.

"Additionally, the reference to concerns regarding the gang questionnaire certainly appeared to be genuine. And to the extent it would rise to the level of a concern, to exercise or justify a peremptory challenge is understandable, given the nature of this particular case.

"As it relates to [A.L.], she was an individual that was spoke to involving her scheduling and so forth, and to the extent [the prosecutor] has indicated his reluctance to keep her on this panel, recognizing that she is a teacher, how she placed herself on a scale from 1 to 10, in addition to her body language, those, likewise, would fall under the category of jury characteristics and would, therefore, justify group neutral reasoning.

"To the extent there have been a number of Hispanic individuals who have been accepted on the panel, at one time or another, the court does not look for a pattern of discrimination. While that was the law quite a few years ago, it is no longer the case and a *Batson/Wheeler* motion can be run, even on a single peremptory challenge, since it does not affect an individual's due process rights as it relates to a discriminatory purpose for any individual being released from the panel without justification or without a group neutral reason.

"So while I do understand and place it in its proper context that the panel has been accepted seven separate times with individuals remaining on the panel that appear to be of Hispanic descent does not sway this court in any particular fashion. Only to the extent the court can consider it for the limited purpose of determining how many additional individuals are on this panel of Hispanic origin.

19.

"But for purposes of releasing these individuals specifically, while opposing counsel might not agree with the reasoning behind releasing an individual when considering the totality of the circumstances of the individual's representations, this court must consider it as it relates to the reasons stated by the party who is exercising a peremptory challenge to release the individual and determine whether those reasons are genuine or fabricated.

"It appears to the court that [the prosecutor's] reasoning, as stated on the record two separate times, certainly do qualify as neutral reasons for purposes of a defense to this motion. On that basis, the court is going to deny the *Batson/Wheeler*."

## C.    *Analysis*

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' [Citation.] ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' [Citation.] The law also recognizes ' "a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759–760 (*Holmes*).)

" ' "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] 'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " ' [Citation.]" (*Holmes*, *supra*, 12 Cal.5th at p. 760.)

20.

" ' "The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons.  … All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." '  [Citation.]  ' "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' " (*People v. Miles* (2020) 9 Cal.5th 513, 539 (*Miles*).)

" ' " ' "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." ' " ' [Citation.]  However, ' "[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." ' [Citation.]" (*Miles*, *supra*, 9 Cal.5th at p. 539.)

"Where, as here, the trial court ruled pursuant to the third stage of the analysis, we skip to that stage to examine whether the trial court properly credited the prosecutor's reasons for the challenges.  'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.]  "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.]  We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and

reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." ' " (*Miles*, *supra*, 9 Cal.5th at p. 539.)

Defendant acknowledges that trial court need not make specific comments on each reason asserted by the prosecutor. However, defendant observes that global findings are not permitted where the prosecutor's stated justifications are implausible or unsupported by the record. As explained below, defendant has failed to show the prosecutor's stated justifications are implausible or unsupported by the record (except, arguably, as to A.L.'s profession discussed below). Therefore, we reject defendant's claim the trial court failed to address each reason asserted by the prosecutor.

### D.     *A.M.*

Defendant acknowledges that the prosecutor stated he dismissed A.M., in part, because of youth and inexperience. He further concedes that those are permissible bases for peremptory challenges. Yet, later defendant argues A.M. did not display an inability to evaluate the facts of this relatively simple case. However, we are concerned with "the subjective genuineness" of the reason given by the prosecutor, "*not* on the objective reasonableness of those reasons.…" (*Miles*, *supra*, 9 Cal.5th at p. 539.) Defendant may have drawn a different inference from A.M.'s youth and lack of life experience than the prosecutor did. But that fact is irrelevant. What matters is whether the prosecutor's reason was genuine. There is nothing inherently implausible in the prosecutor's stated reason, and no compelling reason to doubt its genuineness.

Defendant compares A.M. to another prospective juror – M.W. – as to "so-called life experience." Defendant notes that M.W. also had little life experience, yet the prosecutor declined an opportunity to strike him.

As the parties acknowledge, jurors cannot be compared on a single dimension such as life experience. "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by *other* answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable." (*People v. Lenix*

(2008) 44 Cal.4th 602, 624.) Because of these realities and the complexities of human nature, it is improper to focus on a comparison of isolated factors. (*Ibid*.) Defendant acknowledges that while the two might both lack extensive life experience, there *is* an important distinction between A.M. and M.W. as to a different factor: both of M.W.'s parents previously worked in law enforcement. In contrast, A.M. did not identify any family members when asked if he knew anyone in law enforcement. It remains entirely plausible the prosecutor declined to strike M.W. because considerations like M.W.'s parents' prior profession outweighed the relative lack of life experience.[9] In contrast, the prosecutor concluded that the sum of considerations against A.M. rendered him sufficiently undesirable to the prosecution.

Defendant also contends that an additional reason offered by the prosecutor – that A.M. wore certain articles of clothing multiple days in a row – was "ridiculous" and implausible. We fail to see how. There is nothing implausible about a prosecutor concluding that wearing certain articles of clothing multiple days in a row displays a lack of responsibility or interest in presentability that would be undesirable in a prospective juror. Even if this reason were deemed trivial, it would suffice because it is neutral. (See *People v. O'Malley* (2016) 62 Cal.4th 944, 975; but see Code Civ. Proc., § 231.7, subd. (e)(9) [new prospective rule].)

Defendant also contends the prosecutor "made it sound as if" A.M. was adamant about not wanting to be a peace officer; yet the record does not show A.M. was adamant about the issue. The record does not support defendant's claim that the prosecutor made it sound as if A.M. was adamant. Rather, the prosecutor correctly pointed out that while A.M. wanted to work at the Sheriff's Activities League, he did not want to be a peace

---

**9** Defendant emphasizes that M.W.'s parents worked in law enforcement *before* he was born. However, a prosecutor could have still preferred M.W. knowing he had been raised by people who had chosen law enforcement as a career at one point.

23.

officer.  The prosecutor also said A.M. "had no intention of being a peace officer," which is a wholly accurate description of the record.

First, we note that the prosecutor frequently accepted the panel while prospective jurors with Hispanic surnames were seated.  While this fact " ' "does not necessarily settle all questions about how the prosecution used its peremptory challenges, these facts nonetheless help lessen the strength of any inference of discrimination …." ' " (*Holmes*, *supra*, 12 Cal.5th at pp. 762–763.)  The prosecutor's acceptance of the panel at those junctures was an " ' "indication of the prosecutor's good faith in exercising his peremptories, and … an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection ." ' " (*Id.* at p. 763.)

### E.     A.L.

As to A.L., defendant points to the prosecutor's comment:

> "[A.L.] was the preschool teacher. She had been doing that for ten years, *dealing with special needs*.  The [*sic*] she had never been on a jury before. She gave a response of five as to wanting to be here or not.  I haven't had much luck with teachers *in that area* in my previous trials.  She also has – I think even though she wanted to be on the jury, she stated it was a five, but she wanted to see what it's like, her body language and with that background and schooling, it was concerning to me.  And considering I have 30 preempts total, I figured why take a chance on somebody versus someone that I think would be better for me.  So based on that, I dismissed her." (Italics added.)

In ruling on the *Batson*/*Wheeler* motion, the court stated

> "As it relates to [A.L.], she was an individual that was spoke to involving her scheduling and so forth, and to the extent [the prosecutor] has indicated his reluctance to keep her on this panel, recognizing that she is a teacher, how she placed herself on a scale from 1 to 10, in addition to her body language, those, likewise, would fall under the category of jury characteristics and would, therefore, justify group neutral reasoning."

As defendant points out, the prosecutor was incorrect.  A.L. said she was a preschool teacher and that her *significant other* was a "manager" who "works with people of special needs."

Initially, it is important to note that, as to A.L., the court did not make a " ' "global finding," ' " but instead discussed specific reasons offered by the prosecutor. (See *Miles*, *supra*, 9 Cal.5th at p. 539 [global findings insufficient where prosecutor' stated reasons are unsupported by the record].)

As the court's comments reflect, A.L.'s profession was only one of several justifications offered by the prosecutor. It is true that the prosecutor misstated the *type* of teacher A.L. was. However, the fact that a prosecutor has a mistaken recollection about a prospective juror does not necessarily establish discriminatory purpose. (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 979.) A genuine mistake, such as one arising from faulty memory, is a race-neutral reason for exercising a peremptory challenge. (*People v. Williams* (1997) 16 Cal.4th 153, 188–189.) Thus, even cases like *People v. Arellano* (2016) 245 Cal.App.4th 1139, 1166–1167, draw the important distinction between an "isolated mistake or misstatement" versus a prosecutor's stated reason being completely unsupported by the record. Here, we are dealing with former, not the latter.

The prosecutor's mistake – while unfortunate – is also quite plausible from the record. A.L. mentioned she was a teacher in the same sentence as discussing "people of special needs." The prosecutor's mix up is understandable, given that he made the misstated recollection over 300 pages of transcript later. In the end, we are not dealing with a justification wholly unsupported and contradicted by the record, but rather a plausible mix up by the prosecutor.

Defendant says it was "specious" for the prosecutor to cite as a basis for the peremptory A.L.'s choice "five" on the one to 10 scale of interest in performing as a juror. Defendant notes that Juror No. 5209579 similarly said she was a "five-five" on the same scale yet was seated as a juror. However, "for a comparative analysis to be probative, a seated juror must have a ' "substantially similar *combination* of responses," in all material respects' to an excused juror." (*People v. Bryant* (2019) 40 Cal.App.5th

25.

525, 540.) Defendant has not shown Juror No. 5209579 had a substantially similar combination of responses as A.L.

Defendant notes that the prosecutor did not use a peremptory challenge against a different juror, who was a non-Hispanic retired teacher (Juror No. 5097137). But aside from work experience as a teacher, defendant points to few similarities between the two. And the record discloses substantial differences between the two. Juror 5097137 had previously served on a jury that successfully reached a verdict; was apparently substantially older as evidenced by her five children aged from 32 to 40 years old, and wanted to serve on the jury "eight, nine" out of 10. In contrast, A.L. had never served on a jury, was young enough to have a child who needed to be walked to school while her oldest was still young enough to be going to "camp," and wanted to serve on the jury a five out of 10.

### F.    *C.C.*

Recall the prosecutor identified several bases for dismissing C.C., including "the field that she wants to go into," her physical demeanor, and lack of life experience. Defendant argues that C.C. "was not even a teacher, let alone a special education teacher." The import of this contention is unclear. Career *plans* are a race-neutral justification, just as a current profession would be.

Defendant says a global finding by the court and a failure to probe the prosecutor as to C.C. was improper because the prosecutor's reasons were unsupported by the record. But defendant fails to explain how the record contradicts the prosecutor's reasons. Therefore, he has not established that the court was required to do more than it did with respect to C.C.

Defendant finds meaning in the fact that the prosecutor's first given reason for striking C.C. was that she was from Delano. The parties disagree as to whether Delano's relevance to the case is clear from the record. But that is not the inquiry. There is nothing in the record suggesting the prosecutor's concern with Delano was related to

race.  And defendant points to nothing in the prosecutor's stated reasons regarding C.C. that were contradicted by the record so as to require heightened inquiry by the court.

Because defendant has failed to establish that the prosecutor exercised a peremptory challenge on impermissible grounds, his *Batson*/*Wheeler* claim fails.

## II.       Under Assembly Bill 333, Defendant's Conviction for Active Gang Participation, the Gang Enhancement and the Vicarious Firearm Enhancement Must be Reversed[*]

Defendant contends that under Assembly Bill 333, his conviction for active gang participation, the gang enhancement, and the vicarious firearm enhancement must be reversed.  Under Assembly Bill 333 (2021–2022 Reg. Sess.), "benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational."  (§ 186.22, subd. (g).)  The Attorney General concedes the issue because a reasonable jury could conclude the "common benefit" of the murder in this case was not more than reputational, and we accept the concession.  (See *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032–1033.)

The prosecution may retry defendant on the reversed conviction and enhancements.  (See *People v. Vasquez*, *supra*, 74 Cal.App.5th at p. 1033.)

## III.      Assembly Bill 333 Impermissibly Amends Proposition 21

### A.       *Proposition 21*

Voters approved Proposition 21 on March 7, 2000.  In that initiative, the voters found that "[c]riminal street gangs and gang-related violence pose a significant threat to public safety and the health of many of our communities.  Criminal street gangs have become more violent, bolder, and better organized in recent years."  (Prop. 21, § 2(b).)  The voters predicted that "[t]he problem of youth and gang violence will, without active intervention, increase…."  (*Ibid.*)

---

[*] See footnote, *ante*, page 1.

27.

Accordingly, voters concluded that "[g]ang-related felonies should result in severe penalties. Life without the possibility of parole or death should be available for murderers who kill as part of *any* gang-related activity." (Prop. 21, § 2(h), italics added.) To implement this goal, Proposition 21 made several statutory changes including the one at issue here: adding a new subdivision to section 190.2. That statute sets forth a list of special circumstances in which the punishment for first degree murder is set at death or life in prison without the possibility of parole (LWOP).[10] (See § 190.2, subd.(a).) Proposition 21 added a new special circumstance to this list, which applies to murders where:

> "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (Prop. 21, § 11; see § 190.2, subd. (a)(22).)

Proposition 21 provided that its provisions could not be amended by the Legislature except by a two-thirds vote of each house, or a statute that becomes effective only when approved by the voters. (Prop. 21, § 39.)

### B. *Assembly Bill 333*

#### 1. Changes to Subdivision (f)

Effective January 1, 2022, Assembly Bill 333 amended subdivision (f) of section 186.22 – the provision referenced in the special circumstance established by Proposition 21. (See Stats. 2021, ch. 699, §§ 1–5.) Before Assembly Bill 333, this provision defined a criminal street gang as: "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually

---

[10] For most other first degree murders, there is a third possible sentence: 25 years to life in prison. (See § 190, subd. (a).)

or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f).)

Assembly Bill 333 amended the definition of criminal street gang to read: "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f); Stats. 2021, ch. 699, §§ 1–5.)

Under subdivision (f), one necessary aspect of a criminal street gang is that it has, as one of its primary activities" the commission of crimes listed in subdivision (e). Assembly Bill 333 amended subdivision (e)'s list of crimes, which in turn affects subdivision (f). (See Stats. 2021, ch. 699, §§ 1–5.)

### 2. Changes to Subdivision (e)

Prior to Assembly Bill 333, subdivision (e) defined the phrase "pattern of criminal gang activity" as: "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons…." (Former § 186.22, subd. (e).)

Subdivision (e)(1) through (33) then listed several offenses, such as assault with a deadly weapon, robbery, and discharging a firearm from a motor vehicle. (Former § 186.22, subd. (e).)

After Assembly Bill 333's amendments, subdivision (e) now defines "pattern of criminal gang activity as: "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of

the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational…."  (§ 186.22, subd. (e)(1).)

Assembly Bill 333 also precludes the use of the presently charged offense to establish the pattern of criminal gang activity.  (§ 186.22, subd. (e)(2).)

Assembly Bill 333 also eliminated certain crimes from the list in subdivision (e), including looting, felony vandalism, and several crimes related to access cards, documents or identity theft (§§ 484e, 484f, 484g, 530.5, 529.7; see § 186.22, subd. (e)(1)(A)–(Z).)  As a result of Assembly Bill 333, these crimes cannot be used to establish a pattern of criminal gang activity.  Additionally, looting and felony vandalism can no longer be used to establish the requisite "primary activities" of the group or association under subdivision (f).[11]

### C.  *Effect of Changes Wrought by Assembly Bill 333*

As detailed above, Assembly Bill 333 substantially narrowed subdivision (f)'s definition of criminal street gang in several important ways.  After Assembly Bill 333's amendment, subdivision (f) now excludes from the definition of a criminal street gang those associations or groups whose members have individually – but not collectively – engaged in a pattern of criminal gang activity.

Assembly Bill 333 also narrowed subdivision (f)'s definition of a criminal street gang by substantially restricting the definition of a "pattern of criminal gang activity."  Assembly Bill 333 imposed the new requirement that, to establish a pattern of criminal

---

[11] Even before Assembly Bill 333, the crimes related to access cards, documents, identity theft could not be used to establish the requisite primary activities.  (Former § 186.22, subd. (f).)

gang activity, the prior offenses must have commonly benefitted a gang, and the benefit must have been more than reputational. Additionally, the last of the offenses used to establish a pattern of criminal gang activity now must have occurred within three years prior to the commission of the current offense.

Moreover, Assembly Bill 333's amendment of subdivision (e) narrows subdivision (f)'s definition of a criminal street gang to now exclude those groups or associations whose primary activities include looting or felony vandalism, but do not include the crimes listed in current subdivision (e).

### D. *People's Initiative Power – Constitutional Limits on Legislative Power to Amend*

The People's power of initiative is greater than the power of the Legislature. (*Rossi v. Brown* (1995) 9 Cal.4th 688, 715.) " '[U]nder article II, section 10, subdivision (c) [of the California Constitution], the voters have the power to decide whether or not the Legislature can amend or repeal initiative statutes." (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251.) The voters' power in this regard is "absolute." (*Ibid*.)

" '[T]he purpose of California's constitutional limitation on the Legislature's power to amend initiative statutes is to "protect the people's initiative powers by precluding the Legislature from undoing what the people have done, without the electorate's consent." [Citations.]' [Citation.] In this vein, decisions frequently have asserted that courts have a duty to ' " 'jealously guard' " ' the people's initiative power, and hence to ' " 'apply a liberal construction to this power wherever it is challenged in order that the right' " ' to resort to the initiative process ' " 'be not improperly annulled' " ' by a legislative body." (*People v. Kelly* (2010) 47 Cal.4th 1008, 1025 (*Kelly*).)

Proposition 21 does not permit any legislative amendment except upon two-thirds passage of each house or enactments subject to voter approval. Assembly Bill 333

31.

satisfies neither requirement. Thus, if Assembly Bill 333 amended Proposition 21 at all, it violates the Constitution.

A legislative enactment amends an initiative if it "prohibits what the initiative authorizes, or authorizes what the initiative prohibits." (*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571.) A legislative enactment also amends an initiative "by taking away from it." (*Kelly*, *supra*, 47 Cal.4th at pp. 1026–1027; see also *Proposition 103 Enforcement Project v. Charles Quackenbush* (1998) 64 Cal.App.4th 1473, 1485 (*Quackenbush*).)

Consequently, a legislative enactment can be deemed an amendment to an initiative, even when it does not change the specific language enacted by the initiative itself. (See *Kelly*, *supra*, 47 Cal.4th at pp. 1014, 1030; see also *In re Oluwa* (1989) 207 Cal.App.3d 439, 445.) Any other rule would elevate form over substance and make it trivially easy to completely evade article II, section 10, subdivision (c) of the California Constitution – a provision we are charged with zealously guarding.

### E. *Analysis*

#### 1. **Assembly Bill 333 Amends Proposition 21 by Taking Away from It**

We conclude Assembly Bill 333 is an amendment of Proposition 21. Section 11 of Proposition 21 essentially provided that a certain subset of murders (i.e., gang murders) would be subject to the death penalty or LWOP under section 190.2. Assembly Bill 333 would reduce the scope of murders punishable under section 190.2, subdivision (a)(22) in several ways, as the examples provided below demonstrate. In this way, Assembly Bill 333 "takes away" (*Quackenbush*, *supra*, 64 Cal.App.4th at p. 1485) from Proposition 21.

Under section 11 of Proposition 21, a defendant who intentionally killed the victim while an active member of a group whose members have individually, but not collectively, engaged in a pattern of criminal gang activity, would be subject to a

32.

sentence of death or LWOP under section 190.2, subdivision (a)(22).[12]  Not so under Assembly Bill 333.

Under section 11 of Proposition 21, a defendant who intentionally killed the victim while an active member of a group that engages, or has engaged, in a pattern of criminal gang activity that benefitted the gang only in reputational ways, would be subject to a sentence of death or LWOP under section 190.2, subdivision (a)(22).  Not so under Assembly Bill 333.

Under section 11 of Proposition 21, a defendant who intentionally killed the victim while an active member of a group whose primary activities include looting and felony vandalism, but do not include the other crimes listed in section 186.22, subdivision (e) would be subject to a sentence of death or LWOP under section 190.2, subdivision (a)(22).  Not so under Assembly Bill 333.

Under section 11 of Proposition 21, a defendant who intentionally killed the victim while an active member of a group that engaged in a pattern of criminal gang activity as evidenced by past crimes that met former subdivision (e)'s requirements but not the new requirement that the last offense have occurred "within three years of the date the current offense is alleged to have been committed," would be subject to a sentence of death or LWOP under section 190.2, subdivision (a)(22).  Not so under Assembly Bill 333.

Because Assembly Bill 333 "takes away" from the scope of conduct that Proposition 21 made punishable under section 190.2, it is an amendment.  While the Legislature was free to amend Proposition 21 in this fashion, it could only do so with a two-thirds vote in each house.  (Prop. 21, § 39.)  Assembly Bill 333 did not comply with that requirement and therefore cannot amend Proposition 21.

---

[12] Assuming the murder otherwise met the remaining requirements of section 190.2, subdivision (a)(22).  This qualification applies to all the ensuing examples as well.

### 2. Punishment of a Crime is not Distinct from the Definition of the Crime Being Penalized

With commendable candor, the Attorney General states there are counterarguments to these conclusions. However, we, like the Attorney General, find them unpersuasive.[13]

The Attorney General cites *People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270 (*Gooden*), which dealt with a similar issue involving Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) and Proposition 7. Among other things, Proposition 7 increased the punishment for first degree murder. Proposition 7 did not authorize the Legislature to amend or repeal its provisions without voter approval. The Legislature subsequently passed Senate Bill 1437, which narrowed the universe of conduct constituting first degree murder. *Gooden* held Senate Bill 1437 did not amend Proposition 7.

*Gooden* held that provisions establishing the punishment of a crime concern a subject "distinct" from those addressed by provisions defining the crime. This conclusion is misguided.

Punishment is a period of confinement, fine, etc. imposed *for* engaging in criminal conduct. (*Gooden*, *supra*, 42 Cal.App.5th at p. 281, quoting *People v. Ruiz* (2018) 4 Cal.5th 1100, 1107.) In other words, punishment is the *consequential relationship* between a criminal penalty *and the conduct on which it is being imposed*.

Because both the penalty and its application to specific, real-world conduct are essential components, punishment is more than specifying a particular number of years in prison or the dollar amount of a fine. A statute would be nonsensical and meaningless if

---

[13] The Attorney General would distinguish *Gooden* on different grounds than we do. The Attorney General notes that while Proposition 7 increased the punishment for an existing crime; Proposition 21 created a special circumstance where none had existed before. And the relevant provisions of Proposition 7 did not incorporate by reference the provisions altered by Senate Bill 1437; whereas section 190.2, subdivision (a)(22) incorporates by reference a provision altered by Assembly Bill 333 (§ 186.22, subd. (f).) However, these formalistic distinctions do not go to the heart of the issue.

it only enumerated a penalty in the abstract, without identifying the crime to which it applies. Identifying the scope of conduct being penalized is as crucial to punishment as identifying the severity of the penalty.

The connection between conduct and consequence is the very core of the policy choice embodied in a punishment provision. Changing the scope of conduct to which particular penalties are attached "amends" that policy choice, for better or worse.

For these reasons, punishment and the scope of conduct being penalized (i.e., the elements of the crime) are not distinct issues. Not because they are "synonymous" (*Gooden*, *supra*, 42 Cal.App.5th at p. 281), but because the latter is an integral, *constituent part* of the former. They are not just related, they are definitionally and conceptually inseparable. They are not distinct.

The dissent acknowledges that, in enacting Proposition 21, the voters undoubtedly intended to increase the punishment for *certain* gang-related murders. (Conc. & dis. opn., *post*, at pp. 4–5.) However, the dissent asserts the increased punishment intended by the voters "survives" Assembly Bill 333. (*Ibid.*) But that simply is not true for the certain gang murders described above in part III.E.1. of the Discussion, *ante*, which are no longer subject to section 190.2 by virtue of Assembly Bill 333.

Since punishment is the *application* of a criminal penalty *to* a particular universe of conduct, narrowing that universe effects a change in *punishment* with respect to the newly excluded conduct. This is true even when the penalty attached to the remaining conduct remains unchanged.

A hypothetical helps illustrate. Imagine a jurisdiction where the only crime relating to driving under the influence was defined as "operating a motor vehicle with a blood-alcohol content of over 0.08" and carried a punishment of six months in jail. And suppose the voters, apparently angered by deaths and injuries caused by all drunk drivers, passed an initiative increasing punishment for that crime to one year in jail. Further suppose the Legislature subsequently narrowed the definition of the crime by raising the

threshold blood-alcohol content to 0.15 percent and above.  One might say such an amendment merely changed an element of the crime and did not affect punishment.  But this formalistic distinction would prove illusory because the amendment to the elements of the crime would have the direct and intentional effect of eliminating *punishment* for certain conduct – e.g., operating a motor vehicle with a blood-alcohol content of 0.09 to 0.14 percent. This exposes the truth that a legislative change to the *elements* of a crime does affect the *punishment* established by the voters.

Fortunately, the framework set forth in *Pearson* and other cases cuts through the formalism of this false distinction by asking a question that goes directly to the heart of the issue:  Does the legislative enactment prohibit what the initiative authorizes, or authorize what the initiative prohibits?  In the hypothetical above, it is clear the voter initiative authorized a one-year jail sentence for, among others, drivers with blood-alcohol content of 0.09 to 0.14 percent, whereas the legislative enactment prohibited it.  Similarly, as summarized above, section 11 of Proposition 21 authorized death or LWOP sentences for certain murderers under section 190.2, which Assembly Bill 333 would undo with respect to a certain subset of those murderers.

The contrary view seems to arise from the premise that, when enacting a punishment provision, voters are concerned with tying increased penal consequences to a particular *label* rather than to specific *conduct*.  For example, that when voters increased the punishment for murder, their intent was to increase punishment for whatever conduct that might be labeled as murder in the future, rather than the real-world conduct encompassed by the definition of murder at the time of enactment.  (See, e.g., *People v. Nash* (2020) 52 Cal.App.5th 1041, 1061–1063 [rejecting argument that Proposition 7's reference to "murder" incorporated "the substantive offense of murder as it stood in 1978"]; *Gooden*, *supra*, 42 Cal.App.5th at pp. 282–284.)  To articulate this premise fully is to see that it is untrue.  Just imagine a jurisdiction where voters passed an initiative to increase the punishment for robbery from two years in prison to four years, and then the

Legislature then swapped the definitions of robbery and burglary. Common sense tells us voters who seek to increase punishment intend that it will be imposed on the conduct encompassed by the definition of the crime at the time of enactment.

### F. *Conclusion*

Because Assembly Bill 333 takes away from section 11 of Proposition 21, it is unconstitutional to the extent it would amend that initiative. (See Cal. Const., art. II, § 10(c).) The appropriate remedy is not to void Assembly Bill 333 in its entirety, but rather to disallow this unconstitutional application of Assembly Bill 333. (See *Kelly*, *supra*, 47 Cal.4th at p. 1048.) Consequently, we hold that Assembly Bill 333 does not alter the scope or effect of section 190.2, subdivision (a)(22). In the following section, we will analyze defendant's claims as to the murder special circumstance without regard to statutory changes made by Assembly Bill 333.

## IV. Sufficient Evidence Supported Special Circumstance Finding[*]

The gang-murder special circumstance requires a sentence of death or life in prison without the possibility of parole for a defendant whom the jury finds has "intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22).) Because the murder must have been carried out *to* further the activities of the criminal street gang, the defendant must have specifically intended to further the activities of the criminal street gang. (*People v. Arce* (2020) 47 Cal.App.5th 700, 714 (*Arce*).)

The special circumstance also applies to defendants who were not "the actual killer" but "who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests or assists, any actor in the commission of" a gang-related murder under subdivision (a)(22). (§ 190.2, subd. (c).)

---

[*] See footnote, *ante*, page 1.

Defendant argues there was insufficient evidence that he specifically intended to further the activities of the criminal street gang.

Intent is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise. (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494–495.) Criminal intent "may be deduced from the circumstances of the crime." (*People v. Grider* (1935) 10 Cal.App.2d 287, 288; see § 29.2, subd. (a).)

Here, the evidence supported the following inferences concerning the circumstances of the crime. Defendant is a gang member. Gang members commit violent crimes like murder to enhance their reputation within the gang and the gang's reputation in the community. This reputation enhancement discourages people from "talk[ing]" to law enforcement, which allows the gang to continue committing crimes. Gang members commonly work together, with one acting as a driver and the other directly committing crimes. The gang to which defendant belongs commits homicides as one of its primary activities. Defendant got into an altercation with an individual, who then ran away. A fellow gang member (Nunez) joined defendant, and they both chased the victim down. Defendant's fellow gang member then shot and killed the victim.

From this evidence, a reasonable jury could infer that fellow gang members Rojas and Nunez jointly engaged in one of their gang's primary activities in order to enhance their gang's reputation for retaliatory violence. The fact that Nunez became involved at all – and was ultimately the actual killer – raises a strong inference that the murder was motivated by the need to uphold or enhance the gang's reputation for retaliatory violence rather than any personal disagreement between Rojas and Ellington.

It is theoretically possible that two members of an organization that commits homicides as one of its primary activities and is concerned with maintaining a reputation for violence and respect, happened to kill a person following an altercation for reasons unrelated to the gang. But that observation is not dispositive on substantial evidence

38.

review. " ' " ' " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " ' "[14] (*People v. Ghobrial* (2018) 5 Cal.5th 250, 278.)

## V. It was not Error to Omit from Jury Instructions a Requirement that Defendant Intended to Further Activities of Criminal Street Gang when Committing the Actus Reus of Sentence Enhancement Under Section 190.22, Subdivision (c)[*]

The court instructed the jury:

"The defendant is charged with the special circumstance of committing murder while an active participant in a criminal street gang, in violation of Penal Code Section 190.2(a)(22).

"To prove that this special circumstance is true, the People must prove that:

"One, the defendant intentionally killed Brandon Ellington;

"Two, at the time of the killing, the defendant was an active participant in a criminal street gang;

"Three, the defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity;

"And, four, the murder was carried out to further the activities of the criminal street gang."

The court also instructed the jury:

"If you decide that a defendant is guilty of first-degree murder, but was not the actual killer, then when you consider the special circumstance of committing murder while an active participant in a criminal street gang, you must also decide whether the defendant acted with the intent to kill. In order to prove this special circumstance for a defendant who was not the actual killer, but who is guilty of first-degree murder as an aider and

---

[14] Defendant's remaining contentions, such as reversal being warranted because some of the gang-related circumstances found in other cases are not present here, is rejected for the same reason.

[*] See footnote, *ante*, page 1.

abettor, the People must prove that the defendant acted with the intent to kill."

The court also instructed the jury:

"If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he or she acted with the intent to kill for the special circumstance of committing murder while an active participant in a criminal street gang to be true. If the People have not met this burden, you must find this special circumstance has not been proved true for that defendant."

Defendant contends the court's instructions were erroneous because they failed to require the jury find he specifically intended to further the activities of the criminal street gang. The parties claim that *Arce*, *supra*, 47 Cal.App.5th 700, requires that he harbor such an intent. We disagree.

The discussion of intent in *Arce*, *supra*, 47 Cal.App.5th 700, stands for the unremarkable proposition that subdivision (a)(22) requires that the defendant who " 'intentionally killed the victim,' " did so with the specific intent of furthering the activities of the criminal street gang. (*Arce*, p. 714.) This is made clear by the statutory text, which requires that the defendant intentionally kill the victim and that the murder was carried out *to* further the activities of the criminal street gang. (§ 190.2, subd. (a)(22).) In order for an act to be carried out "to" have some particular effect, the actor must have intended for the act to produce the effect.

Here, however, defendant was not the actual killer. Thus, his sentence enhancement arises under subdivision (c). And the intent required by that provision is the "intent to kill" – not the intent to further the activities of the criminal street gang.

It is true that for defendant's sentence to be enhanced under subdivision (c), the actual killer (i.e., Nunez) had to intend to further the activities of the criminal street gang. Otherwise, it could not be said that the murder was carried out "to" further the activities

of the criminal street gang, and subdivision (c)'s requirement that a special circumstance under subdivision (a) have been found true would not be satisfied.

But so long as *Nunez* intended to kill *and* to further the activities of the criminal street gang; and defendant intended to kill when he aided, abetted, counseled, commanded, induced, solicited, requested, or assisted Nunez, the intent requirements for enhancing defendant's sentence under subdivision (c) are satisfied. (See § 190.2, subd. (c).) There is no further statutory requirement that defendant also intend to further the activities of the criminal street gang.[15] The absence of an instruction requiring that defendant have intended to further the activities of the criminal street gang is not error.

## VI. Parole Revocation Fine*

The court imposed a $300 parole revocation under section 1202.45. The parties agree this fine was improper because defendant was sentenced to life without the possibility of parole on count 1. However, we do not resolve this issue because defendant will be resentenced on remand.

## DISPOSITION

Defendant's conviction for active gang participation (§ 186.22, subd. (a)), the gang enhancement (*id*., at subd. (b)(1) and the vicarious firearm enhancement

---

[15] It is important to note that subdivision (c) does not cover aiding and abetting alone – it also applies to counseling, commanding, inducing, soliciting, requesting or assisting in first degree murder. Thus, doctrines applicable to aiding and abetting cannot be imported wholesale to the entirety of the conduct encompassed by subdivision (c).

The text of subdivision (c) is relatively clear. If defendant A intentionally killed a victim with the specific intent to further the activities of a criminal street gang, and defendant B "assisted" in the killing with the intent to kill, the statutory intent requirements are met. In that circumstance, subdivision (c) would still apply to defendant B if, for example, he knew defendant A intended to further the activities of a criminal street gang *but did not personally harbor such an intent himself.* So long as defendant B intended to kill the victim when he assisted in the killing, and defendant A's killing of the victim otherwise satisfied subdivision (a)(22), then defendant B would be subject to sentence enhancement under subdivision (c). The text of subdivision (c) requires nothing more.

      * See footnote, *ante*, page 1.

(§ 12022.53, subds. (d) & (e)(1) are reversed.  The matter is remanded for a possible retrial.  In either event, defendant shall eventually be resentenced.

In all other respects, the judgment is affirmed.


POOCHIGIAN, ACTING P. J.

I CONCUR:


DETJEN, J.

SNAUFFER, J., Concurring and Dissenting.

I concur with the majority in regard to the issues presented in sections I, II, IV, V, and VI of the opinion. However, I respectfully dissent only in regard to section III, and would vacate the special circumstance finding as a consequence of Assembly Bill No. 333, as explained below.

Proposition 21, a voter initiative, added the gang-related murder special circumstance to the Penal Code.[1]  The special circumstance sets the penalty for first degree murder at "death or imprisonment in the state prison for life without the possibility of parole" if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."  (§ 190.2, subdivision (a)(22).)

Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1-5) (AB 333), as relevant, amends the section 186.22, subdivision (f) "criminal street gang" definition.  The majority concludes this amendment is unconstitutional as applied to the gang-related murder special circumstance because it impermissibly amends a voter initiative."  (Maj. opn. *ante*, at p. 33; see *People v. Cooper* (2002) 27 Cal.4th 38, 44 (*Cooper*) [limits on amending initiative enactments].)  For the following reasons, I would conclude AB 333 is not an unconstitutional amendment.

Our Supreme Court has "described an amendment as 'a legislative act designed to change an existing initiative statute by adding or taking from it some particular provision.'  [Citation.]  But this does not mean that any legislation that concerns the same subject matter as an initiative, or even augments an initiative's provisions, is necessarily an amendment for these purposes.  'The Legislature remains free to address a " 'related but distinct area' " [citations] or a matter that an initiative measure "does not specifically

---

[1] All statutory references are to the Penal Code.

authorize *or* prohibit." ' [Citations.] In deciding whether" AB 333 amends Proposition [21] "we simply need to ask whether it prohibits what the initiative authorizes, or authorizes what the initiative prohibits." (*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571 (*Pearson*).)

"In resolving the question, we must decide what the voters contemplated. '[T]he voters should get what they enacted, not more and not less.' [Citation.] [¶] This is a question of statutory interpretation. When we interpret an initiative, we apply the same principles governing statutory construction. We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure. " (*Pearson, supra,* 48 Cal.4th at p. 571.)

"Section 190.2[, subd.] (a)(22) was enacted as part of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998, an initiative measure adopted by the electorate at the March 2000 primary election." (*People v. Shabazz* (2006) 38 Cal.4th 55, 65 (*Shabazz*).) Because this section itself remains intact, it sheds no light on the issue[2] and we must look beyond it to divine voter intent.

As pertinent, Proposition 21's "findings and declarations … announced: 'Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties. *Life without the possibility of parole or death should be available to murderers who kill as part of any*

---

[2] Section 190.2, subdivision (a)(22), states in full: "The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

2.

*gang-related activity.'* " (*Shabazz, supra,* 38 Cal.4th at p. 65.) "The legislative analysis of Proposition 21 contained a summary chart of the gang provisions, and stated that [it] '[i]ncreases penalties for gang-related crimes ….' " (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 906.)

In my view, "the voters who approved Proposition [21] … got, and still have, precisely what they enacted—stronger sentences for persons convicted of [gang-related special circumstance] murder …. By enacting [AB 333], the Legislature has neither undermined [this] initiative[] nor impinged upon the will of the voters who passed" it. (*People v. Superior Court (Gooden)* 42 Cal.App.5th 270, 289 (*Gooden*); accord *People v. Nash* (2020) 52 Cal.App.5th 1041, 1058-1061 (*Nash*).)

The majority attempts to distinguish *Gooden, supra,* from Proposition 21 by stating *Gooden* "is misguided" in separating crime and punishment. The majority claims separating crime and punishment in this situation is incorrectly "premise[d]" on the view "that, when enacting a punishment provision, voters are concerned with tying increased penal consequences to a particular *label* rather than to specific conduct." (Maj. opn. *ante*, at pp. 35, 37.) The majority concludes "common sense tells us voters who seek to increase punishment intend that it will be imposed for the conduct encompassed by the definition of the crime at the time of enactment."[3] (*Ibid.*)

---

[3] On this point, *In re Oluwa* (1989) 207 Cal.App.3d 439 (*Oluwa*) is instructive. There, the electorate passed Proposition 7, an initiative which included a limitation for convicted murderers earning postsentence custody credits. To achieve the limit, the electorate rewrote the section delineating punishment for murder (§ 190) by including in it a reference to " 'Article 2.5' " credits. (*Oluwa, supra,* at p. 442.)

"At the time of the enactment of Proposition 7, article 2.5 contained only sections 2930, 2931 and 2932. These sections outlined the manner in which prisoners might reduce their sentences by a maximum one-third for good behavior and participation in prison programs." (*Oluwa*, *supra,* 207 Cal.App.3d at p. 442.)

The legislative analysis accompanying the initiative specifically explained a convicted second degree murderer " 'would have to serve at least 10 years before becoming eligible for parole.' " (*Oluwa, supra,* 207 Cal.App.3d at pp. 442-443.) Later,

But "[t]he definition of a crime is distinct from the punishment for a crime." (*People v. Solis* (2020) 46 Cal.App.5th 762, 779.) A special circumstance allegation is a penalty provision. It "is not a complete offense in itself. It is 'separate from the underlying offense and does not set forth elements of the offense or a greater degree of the offense charged.' " (*People v. Anderson* (2009) 47 Cal.4th 92, 115; see *People v. Jones* (2009) 47 Cal.4th 566, 576 [describing penalty provisions].) As relevant here, the electorate prescribed an alternate punishment for some gang-related murders but did not otherwise establish a new crime.[4]

The Proposition 21 electorate was undoubtedly concerned with increasing the punishment for certain gang-related murders.[5] That increased punishment—life without parole or death—survives AB 333. Accordingly, I respectfully dissent from the majority's conclusion AB 333 does not apply to section 190.2, subdivision (a)(22). I would instead vacate the jury's special circumstance finding based on reasons identical to

---

the Legislature added sections 2933, 2934, and 2935 to Article 2.5. These sections created additional credit earning opportunities for convicted murderers. (*Oluwa, supra,* at p. 443.)

When Oluwa, who began serving his sentence for murder in the interim, sought to benefit from the new statutes, the appellate court rejected his argument because it would contravene voter intent. The court explained, in part, the legislative analysis made clear the "electorate … intended service of 10 calendar years by a second degree murderer before parole consideration." (*Oluwa*, *supra,* 207 Cal.App.3d at p. 445; *Cooper*, *supra,* 27 Cal.4th at p. 45 [*Oluwa* court relied on legislative analysis explanation to ascertain voter intent].).

In contrast, Proposition 21 contains no similar specific explanatory analysis. It focuses on punishment for gang-related murders. That focus endures.

[4] Proposition 21 did enact other crimes provisions, for example sections 182.5 and 186.26.

[5] By certain I mean only those gang-related murders in which the defendant killed *while* actively participating in a criminal street gang *and* were "carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22).) Such murders are a subset of all gang-related murders.

the People's concession to reverse all other gang-related findings.**6** (Maj. opn., *ante* at p. 2.)

SNAUFFER, J.

---

**6** It is important to note AB 333 did more than amend section 186.22. It also created section 1109 which mandates bifurcation in trials charging a gang-related crime allegation (§§ 186.22, subds. (b) & (d)) or the substantive gang crime itself (§ 186.22, subd. (a)). Bifurcation is a procedural matter independent of the amendments to section 186.22. In other words, if the amendments to section 186.22 did not exist, section 1109 would still require bifurcation.

It is unclear whether the section 1109 bifurcation preference would apply to the gang-related murder special circumstance, whether it would apply retroactively to nonfinal cases, whether it constitutes prejudice in this case, or whether it too is an unconstitutional amendment. (See *People v. Montano* (2022) __ Cal.App.5th ___ [2022 WL 2236331] [§ 1109 does not apply to § 190.2, subd. (a)(22)].) What is clear, however, is the section 1109 issue merits independent consideration.

Finally, it is worth noting the constitutional argument the majority relies on was first raised in the final brief filed by the People. The court's briefing schedule afforded Rojas no opportunity to respond to the argument. (See Gov. Code, § 68081.)